NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3252-12T1

BRIAN DUNKLEY,

     Plaintiff-Appellant,

v.

S. CORALUZZO PETROLEUM
TRANSPORTERS,

     Defendant-Respondent.

_____

APPROVED FOR PUBLICATION

June 24, 2015

APPELLATE DIVISION

       Argued June 4, 2014 – Decided September 16, 2014
       Remanded by Supreme Court March 16, 2015
       Reargued telephonically May 18, 2015 –
       Decided June 24, 2015

       Before Judges Lihotz, Maven and Hoffman.

       On appeal from the Superior Court of New
       Jersey, Law Division, Atlantic County,
       Docket No. L-6863-10.

       Richard E. Yaskin argued the cause for
       appellant (Mr. Yaskin and William Riback,
       attorneys; Mr. Yaskin, on the brief).

       Erin L. Peters argued the cause for
       respondent (Golden, Rothschild, Spagnola,
       Lundell, Boylan & Garubo, P.C., attorneys;
       Daniel B. McMeen, of counsel and on the
       brief; Ms. Peters, on the brief).

PER CURIAM

    On March 16, 2015, the Supreme Court remanded this matter,

in light of the recent opinion, Aquas v. State, 220 N.J. 494

(2015).  Previously, we considered the summary judgment

dismissal of plaintiff Brian Dunkley's complaint against his employer, defendant S. Coraluzzo Petroleum Transporters. Plaintiff's complaint alleged violations of the Law Against Discrimination, N.J.S.A. 10:5-1 to -49 (LAD). Dunkley v. S. Coraluzzo Petroleum Transporters, 437 N.J. Super. 366, 370-73 (2014), remanded, 221 N.J. 217 (2015). Plaintiff claimed he was the victim of racial discrimination by Richard Harrington, an employee assigned to train him. Ibid. Plaintiff also "insisted he endured negative consequences after reporting Harrington's conduct," which he maintained ultimately lead to his resignation. Id. at 372. Plaintiff asserted defendant was liable under the LAD for negligence and was vicariously liable by allowing "conduct amounting to a hostile work environment . . . , which caused his constructive discharge" because Harrington was his supervisor. Id. at 373.

We affirmed the summary judgment dismissal of plaintiff's complaint, determining defendant was not liable because once plaintiff informed his supervisors he was experiencing racial discrimination, they immediately took action in accordance with defendant's "properly defined" anti-harassment and anti-discrimination policies, to "protect plaintiff from further discrimination." Id. at 381. "[T]he harm was remedied immediately and effectively[,]" as plaintiff admitted he

experienced no further discriminatory interactions or harassment.  Id. at 383.  As to plaintiff's assertions of "perceived ostracism by co-workers," we concluded such allegations were insufficient to support claims for constructive discharge or hostile work environment under the LAD.  Id. at 382-83.

On remand, the Court ordered we address, "at a minimum," two specific issues:

> (1) [W]hether there is a genuine issue of material fact with respect to plaintiff's direct claim for negligence under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49; and
>
> (2) [W]hether there is a genuine issue of material fact with respect to plaintiff's claim for vicarious liability for the actions of a supervisor under the LAD based on a hostile work environment.
>
> [Dunkley v. S. Coraluzzo Petroleum Transporters, 221 N.J. 217 (2015).]

We permitted limited briefing and conducted a telephonic argument on these issues.  In light of the Court's holding in Aquas, plaintiff maintains summary judgment must be vacated and the matter remanded to the trial court for review of the materially disputed facts surrounding whether defendant adequately acted to prevent discrimination, and also to determine whether Harrington was his supervisor at the time he made the racially-charged remarks.  Defendant disagrees and

asserts plaintiff's proofs fail to sustain a claim for either defendant's direct negligence or vicarious liability because its policies were published and properly implemented to terminate the offending conduct.

We have considered plaintiff's arguments under the Court's guidance set forth in Aquas and conclude plaintiff has presented no factual support showing defendant's conduct was negligent or that it ignored its affirmative duty to prevent discrimination. Defendant adopted well-defined policies to prevent discrimination in its workplace, trained its employees, and, when informed of harassing discriminatory behavior, implemented procedures to curb the conduct. Further, we reject plaintiff's assertions of vicarious liability for alleged supervisory harassment. The facts show defendant enforced its anti-harassment policy and plaintiff suffered "no employment action." Aquas, supra, 220 N.J. at 523-24. Accordingly, we affirm.

Our review begins with a discussion of the Court's recent decision. In Aquas, the plaintiff asserted two LAD claims against her employer, the State of New Jersey, alleging her supervisors subjected her to sexual harassment in the workplace, creating a hostile work environment. Aquas, supra, 220 N.J. at 505. These claims included a direct claim for negligence and a claim for vicarious liability. Id. at 506. The plaintiff had

verbally reported her allegations to supervisors, but never filed a written complaint pursuant to the State's written anti-harassment policy, a copy of which the plaintiff admits she received. Id. at 504. The trial court found the plaintiff presented a prima facie hostile work environment claim, but granted the State's motion for summary judgment, because the State established an affirmative defense by showing an effective anti-harassment policy was in place. Id. at 506. The policy delineated a reporting procedure through the State's Equal Employment Division, which plaintiff failed to follow. Ibid.

On certification to the Supreme Court, the plaintiff argued the affirmative defense was unavailable in cases of sexual harassment by a supervisor, under the LAD. Id. at 507. The Supreme Court examined the plaintiff's vicarious liability sexual harassment claim and the defendant's asserted defenses to the alleged liability. Id. at 499.

Initially adopted in Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 592 (1993), the Court recognized employer liability is exclusively governed by principles of agency. Aquas, supra, 200 N.J. at 511. An employer is liable for torts committed by an employee "while acting in the scope of their employment," as well as those committed by employees, even when acting outside the scope of their employment, if:

(a) the [employer] intended the conduct or the consequences, or

(b) the [employer] was negligent or reckless, or

(c) the conduct violated a non-delegable duty of the [employer], or

(d) the [employee] purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

[Id. at 511 (quoting Restatement § 219).]

See also Lehmann, supra, 132 N.J. at 619.

The Court observed "two primary categories of claims" arise from the alleged sexual harassment of employees: "a direct cause of action against the employer for negligence or recklessness under Restatement § 219(2)(b) . . . [and] vicarious liability under Restatement § 219(2)(d)." Aguas, supra, 200 N.J. at 512. "[O]ften discussed in tandem," the Court distinguished the two types of claims as "analytically distinct from and independent of one another" and, therefore, each clam "must be addressed separately." Ibid.

Addressing the plaintiff's claim for the direct action of negligence or recklessness, the Court noted a plaintiff must prove an employer "failed to exercise due care with respect to sexual harassment in the workplace, that its breach of the duty of care caused the plaintiff's harm, and that [he or] she

sustained damaged." <u>Ibid.</u> In defense to allegations of an employer's direct liability for negligently creating a sexually harassing hostile work environment, the Court recognized "an employer's implementation and enforcement of an effective anti-harassment policy," as "a critical factor in determining negligence and recklessness claims under <u>Restatement</u> § 219(2)(b)."[1] <u>Id.</u> at 499.

Next, the Court addressed the plaintiff's claim for vicarious liability, noting:

> [A]n employee may assert that the employer is vicariously liable for sexual harassment committed by its employee because the sexual harasser purported to act on the employer's behalf and "there was reliance upon [his or her] apparent authority," or because the harasser "was aided in [his or her misconduct] by the existence of an agency relation[ship]" with his or her employer, alleging them.
>
> [<u>Id.</u> at 514 (alterations in original) (quoting <u>Restatement</u> § 219(2)(d)).]

Although <u>Lehmann</u> and its progeny never expressly "address[ed] the analytical framework under which an employer's anti-harassment policy may be considered in a hostile work

---

[1]      <u>Restatement (Second) of Agency</u> has been superseded by <u>Restatement (Third) of Agency</u> (2006). Section 219 of the <u>Restatement (Second) of Agency</u>, along with §§ 220, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237 and 267 have been subsumed and consolidated in <u>Restatement (Third) of Agency</u> § 7.07.

environment harassment claim involving a supervisor," ibid., the Court noted "that [same] jurisprudence strongly supports the availability of an affirmative defense, based on the employer's creation and enforcement of an effective policy against sexual harassment." Id. at 514, 515-17.

The Court adopted what is known as the Ellerth/Faragher test for defending claims alleging vicarious liability for supervisory harassment under Restatement § 219(2)(b), thus allowing employers to plead, as an affirmative defense, the adoption and enforcement of an effective policy against sexual harassment, so long as the employee suffered no tangible employment action. Id. at 523-24 (citing Burlington Indus. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633, 655 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 807-08, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662, 689 (1998)).

We now turn to our examination of plaintiff's complaint. In count one, he asserted a violation of the LAD, alleging defendant "failed to take action" when informed of the "repeated discriminatory racial remarks" made by Harrington, claiming "[d]espite the complaint made by [p]laintiff, [defendant] either took no action to correct or prevent the racial discrimination and harassment in the workplace or took steps which were not

reasonably calculated to end the harassment." Count two alleged defendant "failed to remediate a course of conduct constituting racial harassment, discriminatory intimidation, ridicule[,] and insult of a racial nature, pervasive hostility," creating a "hostile and offensive work environment that intimidated, frightened[,] and offended [p]laintiff," as an African-American. Plaintiff also maintained defendant "delegated the authority to control the work environment to employees and agents who failed to remediate any claims of racial discrimination or hostility in the work environment," causing his constructive discharge, as set forth in count three.

During oral argument, plaintiff insisted defendant was negligent in enforcing its anti-discrimination policy because it did not discipline or fire Harrington and management employees admitted a lack of knowledge of procedural aspects of the policy directed to prevent racial and other discrimination. Further, plaintiff asserted defendant was vicariously liable for Harrington's racially harassing conduct as he held defendant's apparent authority while serving as plaintiff's supervisor during the two-week training period.

Aquas provides a framework for analyzing claims and defenses offered regarding sexual harassment hostile work environment claims. With respect to direct claims for

negligence or recklessness, the Court's discussion, anchored in Restatement § 219(2)(b), applies generally to employer liability for the torts of employees, for any type of discrimination. See id. at 499 ("[A]n employer's implementation and enforcement of an effective anti-harassment policy, or its failure to maintain such a policy, is a critical factor in determining negligence and recklessness claims under Restatement § 219(2)(b)."). We also conclude the Court's analysis of an employer's vicarious liability is limited solely to sexual harassment LAD claims. Rather, the principles can be tailored and adopted to address allegations of other discriminatory conduct.

To prevail on a direct claim alleging defendant's negligence, plaintiff bears the burden to show a defendant negligently created a discriminatory work environment by failing to exercise due care with respect to racial discrimination in the workplace, by breaching the duty of due care, which caused plaintiff harm. See id. at 512. To defend against such a claim as discussed in Aquas, defendant may prove:

> [T]he existence of: (1) formal policies prohibiting harassment in the workplace; (2) complaint structures for employees' use, both formal and informal in nature; (3) anti-harassment training, which must be mandatory for supervisors and managers, and must be available to all employees of the organization; (4) the existence of effective sensing or monitoring mechanisms to check the trustworthiness of the policies and

> complaint structures; and (5) an unequivocal commitment from the highest levels of the employer that harassment would not be tolerated, and demonstration of that policy commitment by consistent practice.
>
> [Id. at 513 (quoting Gaines v. Bellino, 173 N.J. 301, 313 (2002)).]

An employer is not required to meet each and every one of these factors. Rather, it is a balance of facts and circumstances to determine whether the employer shows "the existence of effective preventative mechanisms," Gaines, supra, 173 N.J. at 313, designed to comply with the LAD's defined purpose "to root out the cancer of discrimination." Cicchetti v. Morris Cnty. Sherriff's Office, 194 N.J. 563, 588 (2008). See N.J.S.A. 10:5-12(a). Succinctly, "'the efficacy of an employer's remedial program is highly pertinent to an employer's defense'" against liability under the LAD. Aquas, supra, 220 N.J. at 513 (brackets omitted) (quoting Gaines, supra, 173 N.J. at 314).

Although plaintiff concedes defendant had a formal anti-harassment policy in place, and acknowledges he received specific training on the policy with other employees, plaintiff argues defendant failed to sufficiently satisfy the remaining Gaines factors. He suggested management employees did not receive "civil rights" training, there were no effective monitoring mechanisms "to check the effectiveness of the

policies and complaint structures," and his supervisor's conduct did not demonstrate "an unequivocal commitment" that harassment would not be tolerated.

To support his argument, plaintiff isolates statements made in depositions by some of defendant's management employees. Plaintiff asserts this testimony creates a material dispute of fact regarding the effectiveness of the anti-harassment policy and defendant's commitment to combat racial discrimination, which must be assessed by a jury.

Plaintiff has chosen to edit the deposition transcripts by including only portions that purportedly contain statements he construes as favorable, depriving this court of full review of the context in which all statements were made. Nevertheless, we have examined each of the statements identified by plaintiff and viewed the evidence in a light most favorable to him. Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014). We conclude the record does not support plaintiff's claims of materially disputed facts regarding defendant's implementation and enforcement of its anti-harassment policy.

First, management employees did state they received specific training that addressed discrimination. Elwood Sickler, plaintiff's direct supervisor, testified he, along with defendant's other managers, attended sensitivity training

presented by an attorney, but was unsure of the exact date, stating he believed it was in 2010. He also received racial discrimination training in his prior position in the United States Marine Corps. Sickler mistakenly thought the Human Resources Department (HR), which was principally charged with responding to discrimination complaints, was not in place until sometime in 2011, but also maintained terminal managers were supervising drivers, such as plaintiff. The record actually proves defendant's HR manager was hired in October 2009.

Second, the record includes the employee handbook. One section entitled "Policy Prohibiting Harassment & Discrimination" specifically instructs: "Any employee who has a complaint regarding harassment or discrimination must report the matter to their manager. If that person is not available, or if you believe it would be inappropriate to contact that person, contact the Human Resources Department." The handbook contains a list of telephone numbers, including that of HR.

Third, plaintiff never made a complaint to his supervisor or the HR manager, as instructed by the written policy in the handbook. Harrington's discriminatory conduct came to light only because Sickler noticed plaintiff failed to report for work, called him directly, and arranged for plaintiff to explain what was happening. The next day, Sickler, accompanied by

Thomas Sprague, defendant's safety coordinator, and Steve Cohen, defendant's regional safety manager, met with plaintiff to review and address his concerns. Dunkley, supra, 437 N.J. Super. at 372. At that meeting, for the first time, managerial employees learned of plaintiff's experiences and his expressed concerns Harrington was "a racist." Prior to the meeting, Sickler had not received complaints regarding Harrington or other employees charging them with racially-biased behavior. Sickler made it clear defendant's policy was "there is no race. . . . We are all employees." He arranged for plaintiff's training to be guided by another employee, discussed the situation with Sprague, and also met with Harrington.

Finally, the record contains plaintiff's acknowledgement he had no difficulty with his new trainer and, in fact the two "got along great." Further, plaintiff never saw Harrington again; did not experience any further racially-discriminatory conduct; and was not again exposed to racial harassment. Despite these facts, plaintiff criticized the extent of defendant's investigation, arguing notes should have been taken during his meeting with managers, other individuals should have been interviewed, and Harrington should have been fired. Plaintiff also recounted the work atmosphere following the meeting and his placement with a new trainer, saying things were "different."

He stated other employees "would shy away" and "nobody would even talk to [him]," making him feel "uncomfortable" and preventing him from "getting a fresh start."

Granting all reasonable inferences to plaintiff's evidence, we reject the suggestion <u>Gaines</u>, as adopted by <u>Aquas</u>, requires the jury to assess the degree of effectiveness of defendant's response to plaintiff's complaints when the discriminatory conduct admittedly was addressed and rectified. <u>Aquas</u> emphasized the LAD does not impose "strict liability." <u>Aquas</u>, <u>supra</u>, 220 <u>N.J.</u> at 510-11. We also disagree the jury may assess or even consider whether an employer's decision not to terminate an offending employee denotes the discrimination policy as ineffective.

Here, the facts support the <u>Gaines</u> factors. Defendant proved it adopted a formal policy prohibiting workplace harassment and discrimination. Formal training was conducted, as evinced by the deposition testimony of plaintiff, as well as Sickler. Viewing the events that transpired here, we determine defendant's commitment to prohibit discrimination was not mere lip service. Defendant's managers were proactive: they initiated contact with plaintiff before he uttered a complaint, and thereafter swiftly responded by investigating his complaints

and implementing procedures to assure plaintiff no longer experienced discriminatory treatment.

Moreover, defendant's anti-harassment policy included elements of both formal and informal procedures to receive and address complaints. See Gaines, supra, 173 N.J. at 313. Aggrieved employees were instructed to report untoward conduct to either "their manager" or, if necessary, HR personnel. Importantly, management initiated contact with plaintiff and scheduled a meeting; defendant's formal complaint mechanism was not engaged.

We concede the record is sparse as to whether monitoring mechanisms were in existence to check the "effectiveness of the policies and complaint structures." In part, this resulted because plaintiff did not initiate a complaint.[2] However, once managers were made aware of the situation, they took action pursuant to defendant's anti-harassment policy and plaintiff was no longer victimized.

As to whether plaintiff demonstrated a constructive discharge, his testimony pointed to no tangible action showing

_____

[2] It is also worth noting the record contains information discussing a prior instance of alleged sexual harassment experienced by one of defendant's employees. The discussion by the managerial employees regarding this incident reflected the initiation and implementation of defendant's anti-harassment policy.

retaliatory acts by defendant.[3]  Rather, he generally related his sense people were less interactive and more distant with him. We repeat our originally expressed comments:

> We also conclude plaintiff's perceived ostracism by co-workers fails to support his claim of hostile work environment. <u>See Cokus v. Bristol Myers Squibb Co.</u>, 362 <u>N.J. Super.</u> 366, 382-83 (Law Div.2002) ("The fact that [the plaintiff's] co-workers and superiors chose to limit their contact with [him] to business only and otherwise ignored [him], stared/glared at [him] when they walked by [him], and, even as plaintiff believed—talked about [him] behind closed doors," fails to create a hostile work environment.), <u>aff'd</u> 362 <u>N.J. Super.</u> 245, 246-47 (App. Div.), <u>certif. denied</u>, 178 <u>N.J.</u> 32 (2003).  The Supreme Court has explained, the LAD does not create a "sort of civility code for the workplace[.]"  <u>Battaglia v. United Parcel Serv., Inc.</u>, 214 <u>N.J.</u> 518, 549 (2013).  Rather, it advances "[f]reedom from discrimination."  <u>Id.</u> at 546.  Employee discourtesy and rudeness should not be confused with employee harassment.  Further, an "unhappy" workplace does not  equate to a hostile work environment under the LAD.
>
> [<u>Dunkley</u>, <u>supra</u>, 437 <u>N.J. Super.</u> at 382.]

In summary, defendant, as plaintiff's employer, acted expeditiously and effectively to prevent further racial discrimination.  No prior instances of racial slurs or harassment were known and when plaintiff's complaint surfaced,

---

[3]   Plaintiff filed a certification in opposition to summary judgment which included claims not disclosed in his deposition. We could not evaluate these statements.  However, the names of defendant's alleged management employees was left blank.

it was immediately addressed. "More important, plaintiff's own report [was] he did not experience any further discriminatory harassment and suffered no change in his position, duties or compensation . . . ." Id. at 381-82.

We decline plaintiff's invitation to allow a jury to evaluate its view of whether defendant's policy could be more effective or to assess defendant's decision not to fire the offending employee. It is neither the role of the jury nor the work of courts to intrude so deeply into an employer's operational decisions. Plaintiff never saw Harrington again, which might suggest he was transferred to a different site. Plaintiff's own words demonstrate defendant's policy, as implemented, worked and he completed his training without encountering further derogatory or discriminatory treatment. The legislative objective of the LAD is to assure a commitment to end discrimination in the workplace. See Fuchilla v. Layman, 109 N.J. 319, 334 (1988). The facts here show that was accomplished.

Taken as a whole, this record reflects defendant did not breach its duty or ignore the serious legal responsibilities it owes its employees to eradicate racial discrimination in its workplace. We conclude plaintiff has not identified factual support to show the elements of a negligence action against defendant.

Next, we examine the record as to whether the facts presented suggest defendant is vicariously liable for a supervisor's harassment. In Aquas, the Court identified four questions a plaintiff must affirmatively demonstrate:

> 1. Did the employer delegate the authority to the supervisor to control the situation of which the plaintiff complains . . . ?
>
> 2. Did the supervisor exercise that authority?
>
> 3. Did the exercise of authority result in a violation of [the LAD]?
>
> 4. Did the authority delegated by the employer to the supervisor aid the supervisor in injuring the plaintiff?
>
> [Aquas, supra, 220 N.J. at 514 (alterations in original) (quoting Lehman, supra, 132 N.J. at 620).]

See also Restatement § 219(2)(d).[4]

In Aquas, the Court noted it never explicitly considered the impact of an employer's anti-harassment policy on a vicarious liability claim for supervisory sexual harassment, Aquas, supra, 220 N.J. at 499, but New Jersey nonetheless has

---

[4] "Under Restatement § 219(2)(d), an employee may assert that the employer is vicariously liable for sexual harassment committed by its employee because the sexual harasser purported to act on the employer's behalf and 'there was reliance upon [his or her] apparent authority,' or because the harasser 'was aided in [his or her misconduct] by the existence of an agency relation[ship] with his or her employer.'" Aquas, supra, 220 N.J. at 514 (alteration in original) (quoting Lehmann, supra, 132 N.J. at 619).

"acknowledged the value of effective anti-harassment policies in combatting sexual harassment in the workplace, and recognized that employers will be motivated to implement and enforce such policies if their policies provide a defense to a claim of vicarious liability." Id. at 517.

The Court found support for this principle in federal law construing Title VII, which recognizes an employer defending such a sexual harassment claim may assert as an affirmative defense that the employer had an effective anti-harassment policy and the employee failed to take advantage of or comply with that policy. Id. at 521 (citing Faragher, supra, 524 U.S. at 807, 118 S. Ct. at 2292-93, 141 L. Ed. 2d at 689 and Ellerth, supra, 524 U.S. at 765, 118 S. Ct. at 2270, 141 L. Ed. 2d at 655). Explaining the LAD and Title VII share the common objective "'not to provide redress but to avoid harm,'" id. at 520-21 (quoting Faragher, supra, 524 U.S. at 805-06, 118 S. Ct. at 2292, 141 L. Ed. 2d at 688), the Court explicitly adopted the Ellerth/Faragher affirmative defense:

> In a hostile work environment sexual harassment case under the LAD in which the plaintiff alleges employer vicarious liability under Restatement § 219(2)(d), the plaintiff has the initial burden of presenting a prima facie hostile work environment claim. If no tangible employment action has been taken against the plaintiff, the defendant[-]employer may assert the two-pronged affirmative defense

of <u>Ellerth</u> and <u>Faragher</u>.[5]  To establish that defense, the defendant employer has the burden to prove, by a preponderance of the evidence, both prongs of the affirmative defense: first, that the employer exercised reasonable care to prevent and to correct promptly sexually harassing behavior; and second, that the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to otherwise avoid harm.

[<u>Id.</u> at 524.]

The Court also addressed the definition of a "supervisor," describing it as "a pivotal factor in the application of the agency principles set forth in <u>Restatement</u> § 219(2)(d)."  <u>Id.</u> at 525.  Rejecting the United States Supreme Court's "restrictive definition of 'supervisor,'"[6] <u>id.</u> at 528, the Court adopted an

---

[5]    The affirmative defense is unavailable where "'harassment culminates in a tangible employment action, such as discharge, demotion[,] or undesirable reassignment,'" <u>id.</u> at 522 (quoting <u>Faragher</u>, <u>supra</u>, 524 <u>U.S.</u> at 808, 118 <u>S. Ct.</u> at 2293, 141 <u>L. Ed.</u> 2d at 689), "'because when a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation . . . .  Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.'" <u>Ibid.</u> (alterations in original) (brackets omitted) (quoting <u>Ellerth</u>, <u>supra</u>, 524 <u>U.S.</u> at 761-62, 118 <u>S. Ct.</u> at 2269, 141 <u>L. Ed.</u> 2d at 653-54).

[6]    See <u>Vance v. Ball State Univ.</u>, ___ <u>U.S.</u> ___, ___, 133 <u>S. Ct.</u> 2434, 2443, 186 <u>L. Ed.</u> 2d 565, 591 (2013) ("[A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring,
(continued)

expansive definition of the term "to include . . . employees granted the authority to make tangible employment decisions . . . [and] those placed in charge of the complainant's daily work activities." Id. at 528.

Plaintiff focuses on his claim by asserting Harrington was his supervisor. As we noted in our earlier opinion, the record does not allow us to accept or reject that claim. Nevertheless, we do not need to decide that fact to apply the legal analysis adopted in Aquas.

Here, defendant took no tangible employment action against plaintiff. It is not disputed that plaintiff resigned voluntarily because he "felt uncomfortable," an assertion we have rejected as satisfying the proofs necessary to sustain a constructive discharge claim. Consequently, defendant may assert the two-pronged Ellerth/Faragher affirmative defense, see id. at 524, showing it acted in a reasonable and prompt manner to prevent or correct the harassing behavior and plaintiff unreasonably failed to take advantage of the preventative or corrective measures implemented to avoid further harm. See id.

---

(continued)
firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" (quoting Ellerth, supra, 524 U.S. at 761, 118 S. Ct. at 2257, 141 L. Ed. 2d at 633)).

at 521 (quoting Faragher, supra, 524 U.S. at 807, 118 S. Ct. at 2292-93, 141 L. Ed. 2d at 689).

As discussed above, plaintiff, despite training and the opportunity to formally register his complaint with his manager or HR, unreasonably failed to initiate corrective action. It was defendant who undertook responsibility to determine the reasons why plaintiff failed to return to work, then exercised reasonable care to prevent and correct harassing conduct by the prompt enforcement of its anti-discrimination policy. Once the facts were discovered, no further instance of discrimination occurred.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23                                                        A-3252-12T1